UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
JANET P. MASCOLL,

                 Plaintiff,           **MEMORANDUM and ORDER**

  -against-                                         05-CV-667 (SLT)

LINDA STRUMPF, ESQ., HAL SIEGEL and
BANK OF AMERICA AND SUBSIDIARIES,

                 Defendants.
------------------------------------------------------------------x
**TOWNES, United States District Judge:**

       Plaintiff, Janet P. Mascoll, brings this *pro se* action against Bank of America ("BOA"), certain unnamed BOA "subsidiaries," debt collector Linda Strumpf, Esq., and her employee and husband, Hal Siegel, alleging that defendants violated, *inter alia*, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and New York General Business Law ("GBL") Article 29-H and Section 349 by persisting in attempts to collect a debt which BOA had previously determined was not actually owed. Defendants Strumpf and Siegel (collectively, "Defendants") now move to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), arguing (1) that this Court lacks subject-matter jurisdiction under the *Rooker-Feldman* doctrine; (2) that plaintiff's FDCPA claims are time-barred and (3) that plaintiff's claims under the GBL should be dismissed. For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

       The following facts are set forth in plaintiff's complaint, the allegations of which are assumed to be true for purposes of this motion.

       In November 2001, while in the process of applying for a mortgage, plaintiff learned that defendant BOA had reported to credit reporting agencies that plaintiff owed it a "grossly

delinquent debt of $5,300.00." Complaint at ¶ 10. On November 18, 2001 – three days after a representative of F.T.D. Financial Collection Agency, ostensibly acting on BOA's behalf, contacted plaintiff's parents concerning the debt – plaintiff faxed a letter to BOA's "Security Fraud Department." *Id.* at ¶¶ 11-12. In response to plaintiff's letter, BOA investigated the debt and ascertained that plaintiff did not owe BOA the money. *Id.* at ¶ 14. In a letter dated March 8, 2002, a BOA Fraud Investigator informed plaintiff that BOA had requested that various credit reporting agencies remove the debt from plaintiff's records. *Id.* at ¶ 14-15.

Despite the investigator's conclusion that plaintiff owed nothing, plaintiff was subsequently contacted by two collection agencies which sought to collect on the debt. The first collection agency – Northland Group, Inc. ("Northland") – contacted plaintiff soon after plaintiff received BOA's March 8, 2002, letter. *Id.* at ¶ 16. Plaintiff requested that Northland either "cease . . . collection of the fraudulent debt or provide proof of its existence." *Id.* at ¶ 17. Although plaintiff does not allege that Northland, which "did not validate the debt," *id.*, persisted in its collection activities, plaintiff alleges that she filed an online complaint against Northland on April 24, 2003.

In October 2003, plaintiff received a summons and complaint from defendant Strumpf who, according to plaintiff, was representing "Bank of America/U.S. Equities." *Id.* at ¶ 19. Plaintiff alleges that she "immediately contacted Ms. Strumpf, via Hal Siegel, and faxed the documentation supporting the debt as fraudulent." *Id.* at ¶ 20. However, Defendants never validated the debt or otherwise responded to plaintiff's fax. *Id.* at ¶ 21. Rather, Strumpf proceeded with the litigation, which resulted in a default judgment being entered against plaintiff on January 12, 2004, in First District Court, Nassau County. *Id.* at ¶ 22.

Plaintiff's complaint implies that Defendants then took steps to execute upon this judgment. As a result of these actions, plaintiff was denied access to her money at Nassau Educators Federal Credit Union on April 28, 2004. *Id.* at ¶ 23. On May 5, 2004, after plaintiff complained to various public agencies, the Credit Union contacted Defendants, who apparently authorized the release of plaintiff's funds. *Id.* at ¶ 24-25. On June 2, 2004, however, plaintiff's employer received an "Information and Subpoena request" from Defendants. *Id.* at ¶ 26. Plaintiff alleges that this "ongoing harassment" has caused her "severe and intense emotional distress," as well as "severe embarrassment" and unspecified out-of-pocket expenses. *Id.* at ¶¶ 27-28.

On February 3, 2005, plaintiff commenced this action by filing a fee-paid, *pro se* complaint in this Court. This complaint contains two causes of action. The first alleges that defendants violated various provisions of the FDCPA: 15 U.S.C. §§ 1692c, 1692d, 1692e, 1692g(a) and (b) and 1692f. The second cause of action alleges that defendants violated GBL Article 29-H and Section 349 by "knowingly attempting to collect . . . on a fraudulent debt." Complaint at ¶ 38. Plaintiff seeks "[a]ctual and [s]tatutory damages pursuant to 15 U.S.C. §1692k(a)" and GBL § 602. *Id.* at p. 5. In addition, plaintiff requests that this Court "[p]ermanently enjoin and restrain defendants from violating the Consumer Credit Protection Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the New York General Business Law regarding this matter." *Id.* at pp. 4-5.

Defendants now move pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss plaintiff's complaint against them. Defendants' motion raises three arguments: (1) that this Court lacks subject-matter jurisdiction under the *Rooker-Feldman* doctrine; (2) that plaintiff's FDCPA claims are time-barred and (3) that plaintiff's State-law claims should be dismissed for various reasons. The specifics of these arguments are set forth in the discussion below.

**DISCUSSION**

The Legal Standards for Dismissal under Rule 12(b)(6) and 12(b)(1)

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a court must accept as true all of the factual allegations in the complaint and must draw all reasonable inferences in the plaintiff's favor. *See*, *e.g.*, *Board of Educ. of Pawling Cent. Sch. Dist. v. Schutz*, 290 F.3d 476, 479 (2d Cir. 2002), *cert. denied*, 537 U.S. 1227 (2003); *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997). A court "may not dismiss a complaint unless 'it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief.'" *Jaghory*, 131 F.3d at 329 (quoting *Hoover v. Ronwin*, 466 U.S. 558, 587 (1984) (Stevens, J., dissenting)).

The standard applicable to a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction is "substantively identical" to the standard relating to Rule 12(b)(6) motions, except with respect to the burden of proof. *Lerner v. Fleet Bank*, 318 F.3d 113, 128 (2d Cir.), *cert. denied*, 540 U.S. 1012 (2003). Since "[t]he burden of proving jurisdiction is on the party asserting it," *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996) (citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994)), the plaintiff bears the burden upon a Rule 12(b)(1) motion of proving that the court has subject-matter jurisdiction over the action. *See Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994). Upon a Rule 12(b)(6) motion, it is the defendant who has the burden of proof. *Lerner*, 318 F.3d at 128 (citing *Thompson*, 15 F.3d at 249). However, in determining either type of motion, a court must read a *pro se* plaintiff's pleadings liberally and interpret them as raising the strongest argument they suggest. *See*, *e.g.*, *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir. 2004); *Corcoran v. New York Power Auth.*, 202 F.3d 530, 536 (2d Cir. 1999), *cert. denied*, 529 U.S. 1109 (2000).

The Rooker-Feldman Argument

Defendants' first argument is that this Court lacks subject-matter jurisdiction under the *Rooker-Feldman* doctrine. As originally filed, Defendants' motion relied principally on *Kropelnicki v. Siegel*, 290 F.3d 118 (2d Cir. 2002) – a case in which Defendants themselves were parties – and asserted that this action is "inextricably intertwined" with the Nassau County action. Defendants' Memorandum of Law in Support of their Motion to Dismiss ("Def. Memo") at 4. At oral argument, this Court informed Defendants that *Kropelnicki* was abrogated by the Supreme Court's decision in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005), and granted Defendants leave to file a supplemental brief relating to this issue. Defendants filed that supplemental brief on September 19, 2006. *See* Defendants' Supplemental Memorandum of Law in Further Support of their Motion to Dismiss ("Supplemental Memorandum"). Since plaintiff informed the Court at oral argument that she did not wish to respond to Defendants' supplemental submission, this Court will proceed to decide the *Rooker-Feldman* issue without further delay.[1]

The *Rooker-Feldman* doctrine arises from two United States Supreme Court cases: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). In *Rooker*, the Supreme Court held that a district court lacked

---

[1]In addition to discussing *Rooker-Feldman*, the Supplemental Memorandum raises some new issues, not addressed in the motion practice prior to oral argument. Specifically, Defendants argue (1) that "Issue Preclusion and/or Claim Preclusion" bar this action, (2) that the FDCPA is not applicable to a claim of fraudulent debt and (3) that plaintiff has failed to state a claim for relief under those sections of the FDCPA listed in her first cause of action.

This Court did not grant Defendants permission to raise these issues and, therefore, will not address any issues raised for the first time in the Supplemental Memorandum. Defendants must seek permission to raise these issues in a separate motion in accordance with this Court's revised Individual Motion Practices.

subject-matter jurisdiction over an action in which the plaintiff sought an order declaring a state-court judgment "null and void" on the ground that it violated the federal Constitution. The *Rooker* Court noted that the state-court judgment, even if unconstitutional, was not void but merely "open to reversal or modification in an appropriate and timely appellate proceeding." *Id.*, 263 U.S. at 415. However, since the Supreme Court was the only federal court empowered by Congress to reverse or modify a state-court judgment, the federal district court lacked the requisite appellate authority to grant the relief the plaintiff sought. *Id.*, 263 U.S. at 416.

In *Feldman*, 460 U.S. 462 (1983), the Supreme Court appeared to expand *Rooker* by holding that lower federal courts lacked jurisdiction over federal constitutional claims which, although not directly passed upon by the state court, were "inextricably intertwined" with the state court's determination. In *Feldman*, two unsuccessful applicants to the District of Columbia bar filed suit in federal district court, seeking to challenge the District of Columbia Court of Appeals' refusal to waive a rule requiring that applicants be graduates of American Bar Association-accredited law schools in order to be admitted. The *Feldman* Court recognized that the D.C. Court of Appeals' ruling had both judicial and "legislative" (or administrative) aspects.[2] The ruling was judicial in that it adjudicated the plaintiffs' case, but legislative in that it established a new rule applicable to all subsequent bar applicants.

*Feldman* ruled that the plaintiffs, like all other bar applicants, could contest the legislative aspects. Specifically, the Court held that the district court retained subject-matter

---

[2]Although the *Exxon Mobil* opinion uses the term "legislative" in discussing the *Feldman* decision, the *Feldman* opinion itself uses the term "administrative." The latter term seems more accurate; courts cannot properly "legislate," but the highest court in a jurisdiction has administrative power to set standards for lawyers seeking to practice in that jurisdiction. However, in deference to the *Exxon Mobil* Court – the most recent Supreme Court case addressing *Rooker-Feldman* – this Court will use the term, "legislative."

6

jurisdiction over "claims that the rule is unconstitutional because it creates an irrebutable presumption that only graduates of accredited law schools are fit to practice law, discriminates against those who have obtained equivalent legal training by other means, and impermissibly delegates the District of Columbia Court of Appeals' power to regulate the bar to the American Bar Association." *Feldman*, 460 U.S. at 487. On the other hand, claims which required review of a judicial decision in a particular case were clearly barred by *Rooker*. Therefore, the Supreme Court held that the district court lacked jurisdiction over the plaintiffs' claims that the D.C. Court of Appeals acted arbitrarily and capriciously in denying their waiver petitions. *Id.* at 486-87.

In seeking to distinguish between these two categories of claims, the Supreme Court stated that the latter claims were "inextricably intertwined with the District of Columbia Court of Appeals' decisions, in judicial proceedings, to deny [plaintiffs'] petitions." *Id.* at 486-87.

The Supreme Court never defined the term, "inextricably intertwined." Following *Feldman*, the Supreme Court "mentioned *Rooker* and *Feldman* . . . only in passing or to explain why those cases did not dictate dismissal." *Exxon Mobil Corp.*, 544 U.S. at 287.[3] The Supreme Court thus provided "little guidance in determining when claims are 'inextricably intertwined,'" *Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir. 2002), leaving the Second Circuit and other federal courts "struggl[ing] to define *Rooker-Feldman*'s reach." *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005).

The Second Circuit, unlike the Seventh and Ninth Circuits, defined *Rooker-Feldman* expansively, holding in *Moccio v. New York State Office of Court Admin.*, 95 F.3d 195 (2d Cir. 1996), that the doctrine was "effectively coextensive with doctrines of claim and issue

---

[3]Indeed, in the 23 years since *Feldman* was decided, the Supreme Court has never applied the *Rooker-Feldman* doctrine to dismiss an action for want of jurisdiction. *Exxon Mobil Corp.*, 544 U.S. at 287.

7

preclusion." *Hoblock*, 422 F.3d at 84. Subsequent Second Circuit cases followed *Moccio*. For example, in *Kropelnicki* – the case on which Defendants principally rely – the Second Circuit stated:

> A claim is inextricably intertwined under *Rooker-Feldman* when "at a minimum, . . . a federal plaintiff had an opportunity to litigate a claim in a state proceeding (as either the plaintiff or defendant in that proceeding), . . . [and] the claim . . . would be barred under the principles of preclusion."

*Kropelnicki*, 290 F.3d at 128 (quoting *Moccio*, 95 F.3d at 199-200); *see also Phifer*, 289 F.3d at 57 (citing *Moccio* for the proposition that "[t]here is no question that *Rooker-Feldman* bars . . . challenges to the family court's decisions regarding custody, neglect, and visitation," provided those issues were litigated before the family court).

In March 2005 – three months before Defendants filed their motion to dismiss this action – the Supreme Court abrogated this line of cases, holding:

> The *Rooker-Feldman* doctrine . . . is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.

*Exxon Mobil*, 544 U.S. at 284. Indeed, the *Exxon Mobil* Court singled out *Moccio* as emblematic of cases which incorrectly extended *Rooker-Feldman* "far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738." *Id.* at 283.

The *Exxon-Mobil* Court directed lower federal courts not to dismiss actions for lack of subject-matter jurisdiction "simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Id.* at 293. The Court noted that, once a state-court adjudication was complete, disposition of a pending federal action raising the same or similar issues would be governed by preclusion law. Thus, "[i]n parallel litigation," federal courts would "be bound to recognize the claim- and issue-preclusive effects of a state-court judgment," if required under the Full Faith and Credit Act, 28 U.S.C. § 1738 (which provides that a federal court must give the same preclusive effect to a state-court judgment as another court of that State would give). *Id.* Similarly, "[i]f a federal plaintiff present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . ., then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id.* (internal quotations and citation omitted; brackets and elipses in original).

Following *Exxon Mobil*, the Second Circuit thoroughly analyzed that decision and its impact on the Second Circuit's own *Rooker-Feldman* jurisprudence. *See Hoblock*, 422 F.3d 77. The Second Circuit acknowledged that *Moccio* and progeny were "incorrect" in light of the Supreme Court's "teach[ing] that *Rooker-Feldman* and preclusion are entirely separate doctrines." *Id.* at 85. The Second Circuit explained that "[t]he 'inextricably intertwined' language from *Feldman* led lower courts, including this court in *Moccio* . . ., to apply *Rooker-Feldman* too broadly." *Id.* at 86. Noting that *Exxon Mobil* used the phrase, "inextricably intertwined," but did not "explicate or employ it," the Second Circuit concluded that this phrase had "no independent content," but was "simply a descriptive label attached to claims that meet the requirements outlined in *Exxon Mobil*." *Id.* at 86-87.

9

The *Hoblock* Court distilled from *Exxon Mobil*'s holding "four requirements for the application of *Rooker-Feldman*": (1) the federal-court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by the state-court judgment; (3) the plaintiff must invite district court review and rejection of that judgment; and (4) the state-court judgment must have been rendered before the district court proceedings commenced. *See id.* at 85. However, the Second Circuit noted that *Exxon Mobil* "scarcely elaborates on what [these requirements] might mean," other than to "give some negative guidance as to what cases are *not* captured by the requirements." *Id.* at 86 (emphasis in original). The Second Circuit then attempted to fill that perceived void.

In so doing, the Second Circuit struggled with the issue of how to distinguish between claims that were "independent" of the state-court judgment and claims that "assert injury based on a state judgment and seek review and reversal of that judgment." *Id.* at 87. The Second Circuit found that "[t]he key to resolving this . . . lies in the second substantive *Rooker-Feldman* requirement: that federal plaintiffs are not subject to the *Rooker-Feldman* bar unless they *complain of an injury* caused by a state judgment." *Id.* at 87 (emphasis in original). The Court found this to be "the core requirement from which the others derive," and opined that "focusing on it helps clarify when the doctrine applies." *Id.*

The Second Circuit then proceeded to apply this second requirement to the *Hoblock* facts. In *Hoblock*, the plaintiffs brought a § 1983 action in federal court against a county board of elections, alleging that the board had violated their constitutional rights by refusing to count certain absentee ballots. However, the New York Court of Appeals had previously ruled that such ballots should not be counted. After noting that the board was acting under compulsion of a state-court order in refusing to tally the votes, the *Hoblock* Court stated:

> Can a federal plaintiff avoid *Rooker-Feldman* simply by clever pleading – by alleging that actions taken pursuant to a court order violate his rights without ever challenging the court order itself? Surely not. [For example]. . ., if the state has taken custody of a child pursuant to a state judgment, the parent cannot escape *Rooker-Feldman* simply by alleging in federal court that he was injured by the state employees who took his child rather than by the judgment authorizing them to take the child. The example shows that in some circumstances, federal suits that purport to complain of injury by individuals in reality complain of injury by state-court judgments. The challenge is to identify such suits.
>
> The following formula guides our inquiry: a federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it. Where a state-court judgment causes the challenged third-party action, any challenge to that third-party action is necessarily the kind of challenge to the state judgment that only the Supreme Court can hear.

*Id.* at 88.

At first blush, the example set forth in *Hoblock* would seem to militate in favor of holding that plaintiff's claims in this case are barred by *Rooker-Feldman*. However, in *Francis ex rel. Francis v. City of New York*, No. 04-5305-CV, 2006 WL 2091235 (2d Cir. July 26, 2006), the Second Circuit addressed facts very similar to those set forth in the above-cited *Hoblock* example, and reached a seemingly inconsistent conclusion. In *Francis*, the plaintiffs sued a caseworker employed by the Administration for Children's Services, alleging that her decision to remove their children, without the existence of imminent danger to the lives or health of the children, violated the plaintiffs' Fourteenth Amendment rights and was motivated by discriminatory animus. In an order issued prior to *Exxon Mobil*, the district court construed the claim that there was no imminent danger as a challenge to a state-court order granting

11

emergency removal and dismissed the Fourteenth Amendment cause of action pursuant to *Rooker-Feldman*. *See Francis v. City of New York,* No. 04 CV 417 (RPP), 2004 WL 1941265 (S.D.N.Y. Aug. 31, 2004). The Second Circuit reversed the district court, thus holding that *Rooker-Feldman* did *not* mandate dismissal of the Fourteenth Amendment claim.

One can reconcile the seemingly contradictory decisions in *Hoblock* and *Francis* if one reads the *Hoblock* example as envisioning a lawsuit alleging that "state employees" violated the plaintiff's rights, not by initiating removal proceedings, but simply by removing the children from the home pursuant to a court order. Since the employees would merely be effecting the will of the family court, a suit against such employees would essentially constitute a roundabout attack on the state-court ruling. On the other hand, the lawsuit in *Francis* accuses a state employee of deliberately misusing judicial process to deprive the plaintiffs of a constitutional right – the liberty interest in raising their own children. The plaintiffs in *Francis* were not seeking to undo the emergency removal order; indeed, the lawsuit would continue even if the emergency order was vacated.

The plaintiff in this case, like those in *Francis*, is not challenging a state-court ruling. Although plaintiff seeks to "[p]ermanently enjoin and restrain defendants from violating the Consumer Credit Protection Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the New York General Business Law regarding this matter," Complaint at pp. 4-5, plaintiff does not expressly seek an order vacating the Nassau County court's judgment. Indeed, the complaint, which implies that defendant Strumpf authorized the Nassau Educators Federal Credit Union to release funds to plaintiff, implies that Defendants have recognized that the debt is invalid and have abandoned their attempts to execute that judgment.

12

Construed liberally, the complaint in this case principally claims that Defendants misused judicial process by wrongly persisting in efforts to collect on a debt which they knew or, in the exercise of due diligence, should have known that BOA and U.S. Equities had no right to collect. Although this claim may deny a legal conclusion of the Nassau County Court – namely, that Defendants are legally entitled to recover on the BOA debt – it nonetheless raises an independent claim. This action, in which plaintiff primarily seeks money damages, would continue even if the state-court judgment were vacated. Therefore, this Court concludes that the *Rooker-Feldman* doctrine does not bar this action.

The FDCPA Statute of Limitations Argument

Defendants' second argument is that plaintiff's FDCPA claims are barred by the one-year statute of limitations set forth in 15 U.S.C. § 1692k(d). Defendants assume that whatever FDCPA violations plaintiff is alleging must have occurred *prior* to their filing of the Nassau County action in October 2003, and reason that "the statute of limitations expired in October of 2004," at the latest. Def. Memo at 8. Defendants claim that, because this action was not filed until February 3, 2005, plaintiff's FDCPA claims are barred by the one-year statute of limitations.

Plaintiff acknowledges that there is a one-year statute of limitations applicable to FDCPA claims. However, plaintiff alleges that "defendants infringed on and violated plaintiff's rights on or about April 28th, 2004 and on or about June 2nd, 2004," and that both events fall within the statute of limitations. Plaintiff's Notice of Opposition to Defendants' Motion ("Pl. Memo") at 6. Plaintiff is not specific about how these attempts to execute a state court judgment violated the FDCPA, but alleges, generally, that "Strumpf and Siegel covertly and deceptively used legal

13

process to forward an unjust and unlawful claim." *Id.* at 7. Plaintiff further implies that the cause of action did not accrue until May 5, 2004 – the day on which she first learned that defendants had prosecuted the Nassau County action and had thereby "abused" the "legal process." *Id.*

In order to resolve this issue, this Court must first identify the acts which plaintiff alleges to have violated the FDCPA. Defendants may be construing the complaint as (1) implying that plaintiff demanded validation of the debt in October 2003 after receiving Defendants' state-court summons and complaint, and (2) claiming only that Defendants failed to provide that validation or to cease collection activity until validation was provided, as required by 15 U.S.C. § 1692g(b). However, as noted above, the complaint can be liberally construed as asserting that Defendants violated the FDCPA by persisting in efforts to collect on a debt which they knew or, in the exercise of due diligence, should have known that BOA and U.S. Equities had no right to collect. Since plaintiff alleges that she did not learn of these efforts until May 5, 2004, and since some of Defendants' attempts to execute on that debt are alleged to have occurred on April 28 and June 2, 2004, this Court cannot determine at this juncture that plaintiff's FDCPA claims, filed on February 3, 2005, are time-barred. Accordingly, that portion of Defendants' motion which seeks to dismiss plaintiff's FDCPA claims is denied.

The State Law Claims

In their third argument, Defendants advance three reasons why plaintiff's claims pursuant to the GBL should be dismissed. First, Defendants assert that GBL Article 29-H does not create a private right of action, but specifically provides that only the attorney general or the district attorney of any county may sue to enforce its provisions. Def. Memo at 9-10 (principally relying

14

on GBL § 602 (2)). Second, Defendants argue that plaintiff has not alleged the "actual injury" necessary to recover under GBL § 349. *Id.* at 10. Third, Defendants argue that if plaintiff's FDCPA claims are dismissed, this Court should decline to exercise jurisdiction over these pendant state law claims.

With respect to the first of these three arguments, it appears well settled that there is no private cause of action under GBL Article 29-H (§§ 600-603). *See Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (citing *Varela v. Investors Ins. Holding Corp.*, 81 N.Y.2d 958, 961, 598 N.Y.S.2d. 761, 762 (1993)). Although Article 29-H prohibits principal creditors or their agents from engaging in certain practices (which are listed in GBL § 601), GBL § 602 specifically "authorizes only the Attorney-General or a District Attorney to commence an action for violation of [§ 601]." *Varela*, 81 N.Y.2d at 961, 598 N.Y.S.2d. at 762.

Defendants are also correct in asserting that plaintiff does not have a claim under GBL § 349, although not necessarily for the reason Defendants assert. Section 349 "'was designed to protect consumers from various forms of consumer fraud and deception.'" *Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 413 (S.D.N.Y. 2004); *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 155 F. Supp. 2d 1, 25 (S.D.N.Y.2001) (quoting *Smith v. Triad Mfg. Group, Inc.,* 255 A.D.2d 962, 964, 681 N.Y.S.2d 710, 712 (App. Div. 4th Dep't 1998)). While the statute provides a private right of action to any person injured by a business' deceptive act or practice," *see Riordan v. Nationwide Mut. Fire Ins. Co.,* 977 F.2d 47, 51 (2d Cir.1992) (citing GBL § 349(h)), a defendant cannot use § 349 as a vehicle for alleging violations of GBL § 601. *See Conboy*, 241 F.3d at 258. Rather, "[a] plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was

15

misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Bildstein*, 329 F. Supp. 2d at 413 (quoting *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 895 (2000)). Thus, "a Section 349 violation requires a defendant to mislead the plaintiff in some material way." *Conboy*, 241 F.3d at 258.

In this case, plaintiff appears to be arguing that Defendants misled the Nassau County court by representing that the debt was valid when Defendants knew that it was not. However, plaintiff's complaint does not assert that plaintiff, herself, was misled in any way. Accordingly, this Court finds that plaintiff's complaint does not state a cause of action under GBL § 349.[4]

## CONCLUSION

For the reasons set forth above, Defendants' motion is denied to the extent that it seeks (1) to dismiss this action for lack of subject-matter jurisdiction pursuant to the *Rooker-Feldman* doctrine and (2) to dismiss plaintiff's first claim for relief on the ground that plaintiff's FDCPA claims are time-barred. However, that portion of Defendants' motion which requests dismissal of plaintiff's second claim for relief, which seeks to recover damages under New York General Business Law Article 29-H and Section 349, is granted.

**SO ORDERED.**

/s/
SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
September 25, 2006

---

[4]Since this Court concludes that plaintiff's State law claims should be dismissed, this Court need not reach Defendants' third argument, urging this Court to decline to exercise pendant jurisdiction.